```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   Casper Sleep, Inc.,

 4                  Plaintiff,

 5          v.                              16 Cv. 3224 (JSR)

 6   Jack Mitcham and Mattress Nerd
     LLC,
 7
                    Defendant.
 8
     ------------------------------x
 9                                       New York, N.Y.
                                         August 9, 2016
10                                       4:00 p.m.

11   Before:

12                      HON. JED S. RAKOFF,

13                                       District Judge

14                            APPEARANCES

15   FRANKFURT KURNIT KLEIN & SELZ, P.C.
          Attorneys for Plaintiff
16   CRAIG WHITNEY
     LIJIA GONG
17   CAREN DECTER

18   THOMPSON BUKHER, LLP
          Attorneys for Defendant
19   TIM BUKHER

20

21

22

23

24

25
```

1          MR. BUKHER:

2              (Case called)

3          THE DEPUTY CLERK:  Will counsel identify yourselves

4     for the record and be seated.

5          MR. WHITNEY:  Good afternoon, your Honor.  Craig

6     Whitney, LiJia Gong and Caren Decter, Frankfurt Kurnit Klein &

7     Selz for the plaintiff.

8          THE COURT:  Good afternoon.

9          MR. WHITNEY:  I just want to point out, Ms. Decter has

10    not yet filed her notice of appearance.  It was an oversight

11    before we got here.  I just wanted to make your Honor aware of

12    that in case there's an issue.

13         THE COURT:  That's very disturbing.  We're still

14    delighted to have her here.

15         MR. WHITNEY:  Thank you, your Honor.

16         MR. BUKHER:  Good afternoon, your Honor.  Tim Bukher,

17    Thompson Bukher for the defendants, Mattress Nerd and Jack

18    Mitcham.

19         THE COURT:  Good afternoon.

20             We're here on the defendants' motion to dismiss, so

21    let me hear first from defense counsel.

22         MR. BUKHER:  Your Honor, Tim Bukher for the

23    defendants.

24             As you know, this is a case under the Lanham Act of

25    false advertising, specifically against my clients who are

1   mattress product reviewers, online mattress product reviewers,

2   brought by Casper Sleep Inc., which is a mattress manufacturer.

3           THE COURT:  So one of the things your clients

4   emphasize, in effect, is their objectivity, right?

5           MR. BUKHER:  In fact, one of the allegations here in

6   the complaint is that they do not adequately disclose their

7   objectivity.

8           THE COURT:  Well, let me just find -- in your client's

9   website, let me just find --

10          MR. BUKHER:  If it helps your Honor, I'll say that the

11  clients did state --

12          THE COURT:  There's a long statement about -- that

13  your client has -- which I'm searching for right now.  Just

14  bear with me one minute, I'll find it.

15          MR. BUKHER:  Of course.

16          THE COURT:  So in mattressnerds.com's web page, it's

17  stated, "It's difficult to find an unbiased source or guidance

18  when mattress shopping.  Many mattress guides out there are

19  written by the companies trying to sell their mattress," but in

20  this case, your client has, "switched sides to be on the side

21  of the consumer," so as to be, "brand agnostic and retailer

22  agnostic."

23          Then on the sidebar of mattressnerds.com's web pages,

24  there's an affiliate disclaimer which says, "On my site, I will

25  often recommend products and links to other websites.  In many

1    of those cases I get paid a small commission if you end up

2    purchasing anything through those links.  Unlike a mattress

3    salesman at a store, I don't just get paid commissions from one

4    brand or one retailer, I'm an affiliate for many different

5    companies, so I can help find you great deals no matter what

6    they are.  I have not been paid to write any of these articles,

7    and all these opinions are completely my own.  I also do not

8    accept paid advertising placement on my site.  My only

9    compensation is when I help match a reader to the right product

10    and that reader makes the purchase through a link on my site,

11    and this way I can act as a brand agnostic and retailer

12    agnostic salesman."  Do I have that right?

13            MR. BUKHER:  That's absolutely correct, your Honor.

14            THE COURT:  So what he is promoting as the benefit of

15    his reviews is that he's subjective and unbiased, yes?

16            MR. BUKHER:  Correct.  And your Honor, if we get to

17    the facts of this matter, my client will prove that he has

18    equal pecuniary motivation with respect to any of the brands

19    that he reviews on his website, but I don't think we get to the

20    facts of this case, your Honor, because it's well-settled law

21    that the Lanham Act does not create a cause of action against

22    someone's claims of bias or lack of bias on their website.

23            In this case, there's a lack of proximate cause

24    between --

25            THE COURT:  So I agree that proximate cause is the

1    issue under the Lanham Act -- we'll get to the state cause of

2    action in a minute -- and I agree with you also that there has

3    to be, under the Lanham Act, a false or misleading statement

4    that is the proximate cause.

5          So the assertion, as I understand it, in effect, is

6    that he's affirmatively asserting a lack of pecuniary bias --

7    for lack of a better way to put it -- when, in fact, he alters

8    his reviews depending on whether they're an affiliate or not.

9          MR. BUKHER:  That is the plaintiff's allegation, which

10   we'll accept as true for the purposes of this motion, and then

11   moving again to whether these assertions could in any way be

12   seen as a proximate cause of plaintiff's losses.

13         THE COURT:  Why not?

14         MR. BUKHER:  Several reasons, in fact, your Honor.

15   The Supreme Court in Lexmark International v. Static Control

16   Components in fact articulated the standard for proximate cause

17   under the Lanham Act false advertisement claims stating, "The

18   plaintiff must show economic or reputational injury flowing

19   directly from the deception brought by the defendant's

20   advertising."

21         Now, in this case, the statements that my client makes

22   are statements going to the quality of his own services, which

23   are product review services, they're not at all statements made

24   to the quality or lack of quality of the plaintiff's product.

25         THE COURT:  But the assertion, as I understand it, is

1    that the only reason anyone would be paying any attention or

2    give any weight to this guy's reviews is because of his

3    assertion that he's economically unbiased.  So that if, in

4    fact, they read a bad review of a Casper mattress, and they

5    therefore purchase some other brand or don't purchase a Casper

6    mattress that they otherwise would purchase, the reason for it

7    is because what they were being told, in effect, was "my

8    unbiased opinion is X" when, in fact, it was failed to disclose

9    or failed to fully disclose the economics involved.

10             MR. BUKHER:  Your Honor, it's our position, which we

11   believe is supported by case law, that plaintiffs only have

12   proximate cause under the Lanham Act if consumers reading our

13   client's reviews decided to purchase or not purchase a Casper

14   bed, and those reviews contain some sort of false statement

15   that caused them, for example, not to purchase a Casper bed.

16             THE COURT:  I guess what I'm trying to get at is,

17   isn't part of the review -- indeed, the only reason anyone even

18   bothers to read the review, is because of the assertions of

19   economic objectivity.

20             MR. BUKHER:  I think ultimately --

21             THE COURT:  So that, in fact, in putting it sort of

22   proximate proximate terms, the person wouldn't even read the

23   review or bother to pay any attention or give it any weight if

24   they knew, for example, that -- and this a much more extreme

25   case than here -- that this reviewer's bought and purchased by

1    the company it's purporting to objectively review.

2          MR. BUKHER:  As you said yourself, your Honor, it's a

3    proximate proximate cause.  We're looking at two steps.  In

4    fact, a recent case, which we urge your Honor to at least view

5    as instructive coming out of the Eastern District of Virginia,

6    this year in May, 2016, arising from the standards set out in

7    Supreme Court Lexmark --

8          THE COURT:  That's a very helpful case and certainly

9    supports your position.  The case is Wall & Associates versus

10   Better Business Bureau, 2016 West Law 3087055, and it came down

11   just a few weeks ago.

12         MR. BUKHER:  That's correct, your Honor.  And there,

13   the facts are practically identical, and you have this

14   proximate proximate cause situation, as you said, basically two

15   steps removed.  I'll quote the court there.  It says, "It

16   appeared that Wall, aware they could not sue under Lanham over

17   true statements and opinions," which is essentially what's

18   being conceded here, they're not attacking the substance of the

19   reviews, "has attempted to identify statements a few steps

20   removed in the causal chain, and this fails the proximate cause

21   test under Lexmark."

22         We're arguing the exact same thing here, your Honor.

23   Basically, they're trying to make a claim that's wobbly under

24   Lanham Act and they fail, and so they're trying to essentially

25   make a claim that really belongs to the Fair Trade Commission

1    under the FTCA, which does not provide a valid cause of action,

2    your Honor.

3    　　　　THE COURT:  Let's switch gears for a minute to

4    Section 349 of New York general business law.  So that's a

5    broader statute, and it prohibits deceptive acts or practices

6    in the conduct of any business trade or commerce or in the

7    furnishing of any service.

8    　　　　So assuming for the sake of argument that the Lanham

9    Act claim is deficient in the ways you've argued, why couldn't

10   they still have a claim under Section 349?

11   　　　　MR. BUKHER:  Well, your Honor, New York courts have

12   consistently held that Section 349 is not a false advertising

13   statute for businesses to resolve civil disputes of this

14   nature, it's specifically tailored to protect danger to public

15   health and safety.

16   　　　　THE COURT:  You say that, but I don't see that in the

17   New York decisions.  This is a New York law, and the decisions

18   that have given it the very narrow -- or maybe that's the wrong

19   way to put it.  They have talked about the need for subduing

20   any ramifications for the public at large, or for potential

21   danger to the public health or safety, or language of that sort

22   are mostly decisions from my colleagues in the federal court,

23   mostly district court cases which, of course, I always take a

24   good look at but which are not ultimately binding on me.

25   　　　　What is binding on me are New York Court of Appeals

1    decisions and the Second Circuit interpretations of the

2    New York Court of Appeals, and those seem to be simply saying

3    that there has to be consumer-oriented conduct that is

4    materially misleading, and that an injury that arises from the

5    allegedly deceptive practice.  That's the Second Circuit's take

6    on it in Orlander v. Staples, VO2 F.3d 289.

7         The New York Court of Appeals itself has emphasized

8    that "Section 349 is a broad remedial statute."  That's a quote

9    from Blue Cross/Blue Shield of New Jersey versus Philip Morris.

10   3 NY3d 200.

11        The New York Court of Appeals has also mentioned that

12   Section 249, "applies to virtually all economic activity, and

13   its application has been correspondingly broad."  That's a

14   quote from Karlin v. IVF, 93 NY 2d 282.

15        Maybe I've missed it, but what is the decision from in

16   the New York Court of Appeals or some other New York court that

17   gives it the narrow interpretation that you want me to give it?

18        MR. BUKHER:  Your Honor, I would point you to

19   Securitron Magnalock Corp. v. Schnabolk, if I pronounced that

20   correctly, which is a Second Circuit decision, 1995, 65 F.3d

21   256.  Essentially, it goes into the fact that 349 has been

22   viewed by the court under two standards; one is when consumers

23   make a complaint, because again, the law is tailored to protect

24   consumers, and one where corporate plaintiffs make a complaint

25   under the statute.  Specifically, the case underscores the fact

1    that the law was not tailored for corporate plaintiffs to

2    resolve what are essentially trademark or Lanham Act false

3    advertising grievances.  It says that, "Unlike consumer

4    plaintiffs, corporate plaintiffs only have standing to bring

5    claims under Section 349 of the New York general business

6    law" -- and I quote this -- "so long as some harm to the public

7    at large is at issue."  No harm to the public at alarm can be

8    alleged here, your Honor.

9            THE COURT:  That's a case I must admit I haven't yet

10   read, so you undoubtedly cited it, I just haven't had a chance

11   to read it.  Give me that cite again.

12           MR. BUKHER:  It is 65 F.3d 256.

13           THE COURT:  Second Circuit?

14           MR. BUKHER:  Second Circuit 1995.

15           THE COURT:  Okay.

16           MR. BUKHER:  It accords with the Southern District

17   case but --

18           THE COURT:  I'm aware of the Southern District cases

19   that support the position you're taking --

20           MR. BUKHER:  The Romeo and Juliette case.

21           THE COURT:  -- but they are not binding on me.  I

22   obviously pay attention to them.  All right.

23           We'll come back to you in a minute.  Let me hear from

24   your adversary.  Thank you.

25           MR. BUKHER:  Thank you, your Honor.

 1              MR. WHITNEY:  Hello, your Honor.  So I think -- and I

 2     know we made this point in our briefs, but I can't stress it

 3     enough -- defendants are paid salesmen here.  They are getting

 4     compensated by Casper's competitors, and one competitor in

 5     particular is compensating them to the tune of hundreds of

 6     thousands of dollars to tout that competitor's product and

 7     misdirect consumers from buying Casper's products to buying

 8     Casper's competitor's products.  They are known in the --

 9              THE COURT:  So if there were no statements about "I'm

10     objective", then the fact that there was, in the most extreme

11     case, a commercial bribe wouldn't matter under the Lanham Act,

12     would it?  There's no requirement -- the Lanham Act is not an

13     affirmative disclosure act so far as private plaintiffs are

14     concern.  The FTC can go further, but for you to have the

15     ability to bring this cause of action, you need to show

16     something that is a misrepresentation, true?

17              MR. WHITNEY:  Well, as your Honor said before, without

18     an affirmative statement of impartiality, objectivity, the

19     website would have almost no value.  I mean, if there's

20     something in there --

21              THE COURT:  So all right.  But the statement that you

22     have to show, I think, is that the statement is misleading.  It

23     doesn't have to be false, but it has to at least be materially

24     misleading.

25              Now, looking at the affiliate disclaimer that I read

1    before, he says, "On my site I will often recommend products

2    and links to other websites.  In many of those cases," which

3    one is faced implies but not all, "I get paid a small

4    commission if you end up purchasing anything through those

5    links.  Unlike a mattress salesman in a store, I don't just get

6    paid commission from one brand or one retailer, I'm an

7    affiliate for many different companies so I can help you find

8    great deals no matter where they are.  I have not been paid to

9    write any of these articles and all these opinions are

10   completely my own.  I also do not accept paid advertising

11   placement on my site.  My only compensation is when I help

12   match a reader to the right product and that reader makes a

13   purchase through a link on my site.  This way I can act as a

14   brand agnostic and retailer agnostic salesman."

15        So he's saying, number one, that I don't get any other

16   kind of compensation.  Nothing in your complaint suggests

17   anything to the contrary.  Second, that the compensation he

18   gets through this affiliate arrangement when there is a sale

19   applies to many, but he certainly doesn't say all, products

20   that he reviews.  So what's misleading about that?

21        MR. WHITNEY:  Your Honor, you can't take that one

22   statement in isolation and not look at the other statements

23   he's also making to determine whether or not it's misleading.

24   Which, in fairness, we're going to have to prove that consumers

25   are misled.  You obviously are not going to take my word for

1   it, but we contend that that is misleading, that when he's

2   saying "I'm brand agnostic.  I'm unbiased.  I used to be a

3   salesman and now I switched to be on your team, and I'm just

4   here for you," that's a ruse, your Honor.  He is being paid a

5   substantial amount of money to tout one brand in particular,

6   and he is making consumers think that he's not.  It's false

7   advertising, your Honor.  And, yes, we have to prove that these

8   things are true, and we'll have to prove that consumers are

9   confused, but he certainly makes these statements, and we

10  certainly contend that they are false and misleading.

11          THE COURT:  Well, I'm still not clear in what respect

12  you say what I just read was false and misleading.  Now, there

13  may be other statements we want to take a look at.  Assuming,

14  just to move ahead, assuming for the sake of argument that

15  there are false or misleading statements regarding his economic

16  affiliations.  The reason that's a factor that a consumer would

17  take into account perhaps, but the immediate reason they're not

18  buying your product is because it got a lousy review compared

19  to someone else, right?

20          MR. WHITNEY:  Well, yes.  He's telling you you should

21  buy Casper's competitor instead of Casper.

22          THE COURT:  Even assuming your view, why isn't that a

23  secondary cause, a nonproximate cause?  The immediate cause is

24  the lousy review.  I'm trying to think what would be a

25  good analogy.  I bought the gun to kill you because I wanted

1    your -- because under your will I inherited money.  That would

2    be the motive, but no one would claim that's the proximate

3    cause.  The proximate cause of your death would be my firing

4    the bullet.

5         By the way, the record should reflect I do not have

6    any present intention of taking any of these steps.

7         But why isn't that sort of a fair analogy?  The reason

8    you're not buying the mattress is because of the lousy review.

9    Your motive for crediting the lousy review was your belief,

10   your misguided under your view belief, that it was objective

11   when it was actually being materially affected by the

12   reviewer's economic interests that he didn't adequately

13   disclose, under your views.  But why isn't that one step

14   removed from proximate cause?

15        MR. WHITNEY:  I think you're parsing out the proximate

16   cause perhaps a little too finely, your Honor, under the law.

17        First, I'd like to point out a case for your Honor

18   that I think is very enlightening that was not cited in our

19   brief because it came out very recently, a few weeks ago in

20   this district.

21        THE COURT:  Have you supplied a copy to your

22   adversary?

23        MR. WHITNEY:  I have not.

24        THE COURT:  I will allow you to mention it, but I will

25   give him a chance, after we're through today, if he wants to

1    put in a brief letter about it because he hasn't seen it yet.

2         MR. WHITNEY:  Sure, your Honor.

3         The case is Enigma Software Group v. Bleeping

4    Computer.  It's 2016 WL 3773394, Judge Engelmayer, where the

5    defendant was an affiliate advertiser and the plaintiff was a

6    product manufacturer.  It was a company that developed computer

7    software security products.

8         The defendant was an affiliate of a competitor of the

9    plaintiff's.  They went online, said, "You need to buy this

10   competitor's product," they received commissions from sales in

11   the competitor's product, and Judge Engelmayer, under a Lexmark

12   analysis, determined that there was standing by the product

13   manufacturer, the product brand, to bring a Lanham Act false

14   advertising claim.

15        THE COURT:  By the way, the standing is really -- I

16   know the older case law calls it that, but it's not a standing

17   issue, it's a proximate causation issue.  I think we can all

18   agree on that.

19        MR. WHITNEY:  Yes, your Honor.  Although there's two

20   separate issues with the proximate causation that I think make

21   it a little intertwined, as well.  Because part of it is

22   materiality, is whether what the statement is that the

23   defendants -- the misstatement affected consumer purchasing

24   decisions.

25        That is, first of all, a very fact-based analysis that

1    many courts have said is not really subjected to a motion to

2    dismiss in most instances, which I believe would also be the

3    case here, because we would have to prove that that statement

4    was material.  But the misleading statement by the defendants

5    that, "I'm objective and I have no skin in the game," caused

6    consumers to behave in a particular manner.

7            The Better Business Bureau case that was cited is very

8    different than this case for a very specific reason in that

9    Better Business Bureau is not a salesman, they don't sell

10   products.  Here, the defendants are actively selling

11   competitors' products of Casper.  They are saying, "Don't buy

12   it there."  Taking a side-by-said analysis saying, "Don't buy a

13   Casper, buy a Leesa.  Click here right now to buy it, and then

14   I get paid a lot of money to do that."  That is false

15   advertising your Honor.  They are acting on behalf of these

16   companies, they are making statements, they're making

17   side-by-side comparisons, which I would say in addition to the

18   misleading statement about their objectivity is actually

19   misleading about the Casper product.  I don't take defendant's

20   position that they don't say anything about the product to be

21   the end of the story.  They are saying that the Casper mattress

22   is not as good as these other mattresses.  They're making

23   several objective -- I'm sorry -- several -- yeah --

24   comparative -- substantiable comparative analyses with Casper's

25   competitors saying, "A lot of people like the Leesa better."

1    Well, what is the evidence of that?  What is the substantiation

2    behind that?  Leesa certainly couldn't make that claim, and

3    defendants can't make that claim.  That's a statement of fact,

4    and that's untrue, unless they have substantiation for it.

5            They're saying that the foam layers on Casper's aren't

6    as good for most people as the foam layers on the Leesa

7    mattress.  I'm using this as the example.  That is a statement

8    that is verifiable, and again, we would say that is untrue and

9    it's part of misstatements we are alleging in the complaint.

10           There are actually false statements about the Casper

11   product, I would submit, your Honor, but in addition, the

12   entire purpose for defendant's existence is to sell these

13   competing products, and they are duping the consumers into

14   believing they're not.  It's native advertising.  It's somewhat

15   novel in the era of social media and the new millennium, so to

16   speak, or whatever.  I'm dating myself, but -- and that is why

17   the FTC actually --

18           THE COURT:  I can't remember back to the new

19   millennium.

20           MR. WHITNEY:  Your Honor, my point is that there

21   probably aren't a ton of on-point cases directly focusing on

22   this advertising because it is relatively new, which is one of

23   the reasons why the FTC has come down so strongly and tried to

24   put some guidelines as to what the behavior is.  That doesn't

25   mean that the Lanham Act doesn't apply here.  That doesn't mean

1    that the statements are not misleading and are not duping the

2    public.  They are causing competitors -- this is what we've

3    alleged -- are causing competitors of Casper to buy mattresses

4    base on false statements, or at least misleading statements.

5          THE COURT:  Let me switch gears on you also to the

6    state cause of action.

7          Now, your adversary brought my attention to a case

8    that I hadn't looked at when he cited it, but thanks to my law

9    clerk I now have looked at it.  Securitron v. Schnabolk, 65

10   F.3d 256, Second Circuit, 1995 in which the Court of Appeals

11   says, "The critical question then is whether the matter affects

12   the public interest in New York, not whether the suit is

13   brought by a consumer or a competitor."

14         So assuming, arguendo, that that is binding on me and

15   still good law, what's the harm to the public interest here?

16         MR. WHITNEY:  Well, it's consumer confusion, your

17   Honor.  Everything we're alleging is causing harm to the public

18   in addition to causing harm to Casper's bottom line.  They are

19   being misled.  This is a -- what the -- and I don't believe

20   that this decision changes what many subsequent decisions have

21   held, both at the Court of Appeals, New York State Appellate

22   Division, and other Second Circuit decisions.  This case was

23   really about whether a business competitor -- whether business

24   competitors had standing under 349, which it ultimately

25   concluded that they did.  But nothing, we believe, in that

1    statement changes the general tenor of the statute, which is

2    it's a consumer protection statute, and here, consumers are

3    being harmed, and they are being, again, misled.

4           There are cases we've cited that -- obviously, the

5    fact patterns have slight differences, but they're analogous in

6    the sense that when a consumer is misled to buy a competitor's

7    product, then the plaintiff who is harmed by it has standing

8    and has cause of action under 349.

9           THE COURT:  So do you allege anywhere in your

10    complaint, for example, that if consumers had known, or you say

11    they should have been told, they would have purchased Casper's

12    mattresses?

13           MR. WHITNEY:  I believe we do, your Honor, yes.

14           THE COURT:  Point me to where that is.

15           MR. WHITNEY:  So in the Casper damages section, which

16    is starting on page 15, but it's paragraphs 55 through, really,

17    59 or 60.  What we're alleging, in part -- and we'll

18    obviously -- some of this is on information and belief because,

19    frankly, your Honor, we need a lot of information from the

20    defendants in order to substantiate that consumers were

21    going -- how consumers arrived at their site and where they

22    left.

23           THE COURT:  Yes.  So I think the closest to the

24    statement of the kind that I was looking for is paragraph 58.

25           MR. WHITNEY:  I think that's right, yes.

1      THE COURT:  "Upon information and belief, potential

2    Casper mattress purchasers, including potential purchases

3    located in New York, have been diverted to Mitcham's also

4    misleading Mattress Nerd reviews through Casper-related

5    internet searches.  As a result of being deceived into

6    believing in Mitcham's independence and nonbiases, these

7    consumers have purchased mattresses from Casper's competitors

8    rather than Casper."  So what's your basis for that statement?

9      MR. WHITNEY:  Well, part of it is you go back to the

10   paragraph before, for example, in 57, and the defendant

11   actually makes a few public statements to this regard, but

12   nevertheless, if you look for a Casper mattress online, for

13   example, you're searching for a Casper, meaning you are an

14   interested consumer in a Casper product, you are one -- of the

15   options you get is Mattress Nerd saying, "Hey, look at me.  I'm

16   this objective reviewer.  Don't go to Casper yet, come to me."

17     THE COURT:  I know all that, but I'm saying, what's

18   your basis for alleging in the complaint that that actually

19   affected any consumers?

20     MR. WHITNEY:  Well, your Honor, part of it is

21   information and belief, and the basis is that just by --

22     THE COURT:  So what's the information -- belief, I

23   understand.  What's your information that is the basis?

24     MR. WHITNEY:  It's website traffic.  It's the way that

25   the internet --

1           THE COURT:  For example, have you done any analysis

2     of -- Casper used to be an affiliate, as I understand it,

3     correct?

4           MR. WHITNEY:  Briefly, yes, your Honor.

5           THE COURT:  And what was the difference in -- what was

6     the level of Casper sales?

7           MR. WHITNEY:  I don't know offhand.  But just -- I

8     understand where you're going with this, your Honor.  Part of

9     the difficulty in that analysis in isolation is the level of

10    sales differ on so many factors that you really can't do a

11    one-to-one comparison that would really be all that valuable

12    right there because --

13          THE COURT:  That, I would agree.  That sounds

14    reasonable, yes.

15          MR. WHITNEY:  So you have to look at, all right,

16    there's a certain amount of website traffic that would have

17    gone to Casper, instead went to Mattress Nerd and never came

18    back to Casper.  We have to presume it went to -- some of it we

19    need in discovery.  We don't know the web traffic, and that's

20    part of what we're looking for.

21          THE COURT:  For example, are you going to have an

22    actual consumer step forward and say, "I was just about to

23    purchase a Casper mattress until I read that review, and I was

24    shocked to see how poor a review it was, and so I purchased

25    some other mattress?"

1           MR. WHITNEY:  We have an economist that's going to

2   look at the web trafficking behavior and look at the different

3   sales and Mr. Mitcham's revenue and how it changed over time.

4   We're going to look at -- we're going to have consumer surveys

5   about whether they were confused by this behavior and whether

6   it impacted their purchasing decisions.  There will obviously

7   have to be evidence to that fact.  I think for pleading

8   purposes, there's only so far we can go in light of what we

9   would need in discovery.

10          THE COURT:  I agree.  A survey is perhaps a way to get

11  at this, but how are you going to -- it has to be a survey of

12  people who were actually on the website, yes?  How will you

13  know?

14          MR. WHITNEY:  It would be a survey of potential

15  customers because it impacts future and past --

16          THE COURT:  Potential customers who were

17  nevertheless -- how are you going to show they are potential

18  customers who would have gone to that website?

19          MR. WHITNEY:  I think that's pretty common in Lanham

20  Act surveying, your Honor.  You look at who would be a

21  potential sphere of customers.  If someone said, "My product is

22  better than yours," you're not going to be able to find every

23  single person that felt that they made a purchasing decision

24  based on that behavior -- that was a bad example, but if they

25  make an actual statement, a misrepresentation, you need to look

1    at okay, here's the universe of customers that are potential --

2    a basis for the customers, and how many -- you know, what

3    percentage of them would be redirected.  And in terms of the

4    actual numbers, that's at a level that is going to go to

5    someone who is far greater attuned to e-Commerce than I am as a

6    lawyer.  We will need someone who is an economist that will

7    look into the consumer purchasing behavior and people who are

8    marketing experts and they will put together an expert report.

9         THE COURT:  All right.  Thank you very much.  Let me

10   go back it your adversary.

11        MR. BUKHER:  Your Honor, I just wanted to make a

12   couple of statements.  One of which -- and only the reason I

13   make it is I was very surprised to see my adversary raise this

14   point because it goes quite opposite to the position that he

15   took in his opposition to this motion.

16        Specifically, we devoted a good chunk of our moving

17   paper to how opinions are not actionable under the Lanham Act.

18   And then the opposition paper said "Well, no, we're not saying

19   that your reviews, which are opinions, are actionable, we're

20   not saying they're false or misleading, we're saying that your

21   affiliate disclosures are false and misleading."

22        Now my adversary is saying that the reviews have

23   statements to the effect that most people would not find this

24   mattress comfortable and so on.

25        First of all, that's not alleged.  To the extent that

1    he's made certain reviews, he would say that, "I found this not

2    comfortable.  I think this is not comfortable."  These are

3    opinions, in any case.  But secondly, they are opinions and

4    they are not actionable.

5           The other point that I wanted to make is that we can't

6    assume for the sake of argument, as your Honor said, that

7    certain statements made in the affiliate disclosures are simply

8    misleading.  Because the plaintiff cannot -- under

9    Iqbal/Twombly make a compulsory allegation saying that the

10   defendant made misleading statements and this harmed us.  They

11   have to actually point us to which statements we have to

12   defend.  He's seeking to use these FTCA guidelines to basically

13   say that our affiliate disclosures -- which were made.  There's

14   no question that the affiliate disclosures were made that they

15   disclosed the fact that our client received commissions from

16   other mattress manufacturers, and at some point from Casper,

17   who has only been around from 2014, and I believe only

18   started -- or rather stopped being an affiliate in 2015, which

19   was a year ago -- discloses that he received commissions.

20          They're seeking to say that their disclosures are

21   inadequate under these FTCA guidelines, and because they're

22   inadequate under the FTCA guidelines -- only because they're

23   inadequate under the FTCA guidelines -- they are suddenly

24   misleading and deceptive under the Lanham Act.  That does not

25   work, your Honor.

1            And ultimately -- this goes back to the proximate

2      cause question -- we talked about, you know, this issue of

3      whether consumers think that the website has more value because

4      it represents itself as unbiased.  Okay.  If the consumers

5      think that the website has more value than other product review

6      websites, then I think that other product review websites might

7      have a Lanham Act claim against our client because they are

8      competitors, and potentially, if those affiliate disclosures

9      are misleading, then that could be actionable under the Lanham

10     Act by the competitors.

11            But again, we reach a proximate cause issue when the

12     manufacturer seems to claim that, whether the website has value

13     has some sort of affect on their bottom line, their sales.

14            THE COURT:  All right.  Let me ask you a different

15     question.  Thank you for that.

16            Securitron, the case you brought to my attention a few

17     minutes ago, which I've now had a chance to look at, well, it

18     does have the language you quoted, and of course, in Securitron

19     they did find that there was harm to the public, even though

20     the action was brought by a competitor not by a consumer.  But

21     what also strikes me about Securitron, more importantly, is

22     that it's really rendered before the New York Court of Appeals

23     cases that I referred to earlier, so in that sense, it's not

24     necessarily binding on me, I ultimately have to follow what the

25     New York highest court says about it in the statute.  So I

1   wondered if you wanted to say anything more about that

2         MR. BUKHER: Your Honor, while I'm not as familiar

3   with the New York Court of Appeals cases, I would really just

4   point to whether those Court of Appeals cases talked about

5   corporate plaintiffs. And again, I apologize for my ignorance

6   on that point, but I think to the extent that Securitron is

7   instructive to the extent that it talks about corporate

8   plaintiffs and seems to follow this --

9         THE COURT: Well, what it says, Securitron says -- and

10   here's the relevant language, "Appellants contend that

11   Securitron has no standing to assert a claim under New York

12   general business law Section 349 because Securitron has not

13   demonstrated any harm to the public and is simply a business

14   competitor of the Appellants. We reject this contention.

15   Although the statute is at its core a consumer protection

16   device, corporate competitors now have standing to bring a

17   claim under the statute so long as some harm to the public at

18   large is an issue. The critical question then is whether the

19   matter affects the public interest in New York, not whether the

20   suit is brought by a consumer or a competitor."

21         Then they go on to say, "Here there is harm to the

22   public," although the facts are very different from this case,

23   and so it leaves open the question of whether harm to the

24   public is adequately alleged in this case before us here. In

25   Securitron, the allegation was that the defendant, Schnabolk,

1    caused a regulatory agency to undertake various investigations

2    that proved to interfere with the sale of the product and to

3    lead to false suggestions and so forth.  That was a very

4    different case from this case because the public interest was

5    directly involved through the allegedly false complaint to the

6    Consumer Protection Agency, which then undertook harmful

7    investigations.

8            But nevertheless, the language I just quoted doesn't

9    make the slightest distinction between a consumer plaintiff and

10   a competitor plaintiff as long as the matter affects the public

11   interest.

12           MR. BUKHER:  I think ultimately, your Honor, the

13   question for the Court is to decide whether a website that

14   touts itself as unbiased -- and again, we'll assume for the

15   sake of argument that it is biased -- whether that affects the

16   New York public interest.  I think there are other Southern

17   District courts anyway that opine on questions similar to that,

18   and one in 2015, which I believe is -- again, it's -- may only

19   be instructive to your Honor, but if we look at Conopco Inc. v.

20   Wells Enterprises, 2015 WL 2330115, Southern District,

21   May 14th, 2015 --

22           THE COURT:  Is that case cited in your brief?

23           MR. BUKHER:  It is on page 10, your Honor, of the

24   reply.

25           THE COURT:  Very good.

1          MR. BUKHER:  -- said, "Courts addressing the question

2     of harm under 349 have drawn a distinction between false

3     advertising claims that pose a danger to the consumer and those

4     that merely encourage consumers to buy an inferior product or

5     buy a product from one company where there may have been a

6     preference to buy from another."

7          THE COURT:  Okay.  I'm running short on time because

8     of other matters I have.  Let me just say, is there anything

9     else that you wanted to say?  I'll give your adversary one last

10    shot, also.

11         MR. BUKHER:  That is really it, your Honor.  It's just

12    going back to the question of proximate cause.

13         THE COURT:  Let me hear from plaintiff's counsel.

14         MR. WHITNEY:  Just a few things, your Honor.  I'll try

15    to be brief.

16         One, on the proximate cause question for Lexmark.  The

17    Lexmark case specifically talks about that the injury proximate

18    cause needs to flow from the defendant's wrongdoing, and that a

19    showing is not made, for example, when deception produces

20    injury to a fellow commercial actor that would, in turn, affect

21    the plaintiff.

22         So the proximate cause question is whether the harm is

23    two steps removed from the person who is injured.  So the

24    examples given by the Court was, if the harm is to a tenant,

25    the landlord can't sue as they were harmed, or the electric

1    company can't sue that they're harmed because they're not

2    getting their bill, and these are specific examples included in

3    Lexmark.

4           We submit that we don't believe the Supreme Court was

5    meaning to parse so closely the statement and the injuries so

6    that you don't -- as a standing question that you cannot make a

7    Lanham Act claim.  We are clearly -- you know, my client is

8    clearly the entity that was targeted here and that is impacted

9    by the alleged false and misleading statements, and we've made

10   several statements in our amended complaint about how the

11   injury flowed from the conduct and how we are the party harmed.

12          Defendants like to position themselves as just, again,

13   some mattress review website that only would compete with other

14   mattress review websites.  They are selling competing products

15   directly from their site.  They are linking directly to

16   competitors' products and causing us very significant and very

17   direct harm, so we would submit that this should squarely fall

18   within the Lexmark test.

19          THE COURT:  Let me just, to interrupt for a second.  I

20   now have taken a look at the case you mentioned, Enigma

21   Software -- and I will give your adversary a chance to put in a

22   one-page letter about that if he wishes to.  But to be frank,

23   I'm not going to require him to do that because it doesn't seem

24   to me to add much materiality to this debate.  So this is a

25   23-page single-spaced decision -- 23 pages in the printed thing

1    so it must have been many more pages in the original -- filed

2    by my very energetic colleague Paul Engelmayer.  He only gets

3    to the issue you're talking about at the very, very end,

4    literally a couple of paragraphs before the end of the opinion,

5    and then all he says is, on the question of proximate cause, he

6    outlines what the second amended complaint alleges, and then

7    says that the defendant, "itself acknowledges its ability to

8    influence customers."  So it doesn't sound that -- Judge

9    Engelmayer apparently didn't sound -- like much of a dispute.

10            Again, if your adversary wants to put in a letter not

11   to exceed one page about this case, he's welcome to do so, but

12   I'm not going to require him to do so.  If he does do so, he

13   should do so by the end of this week.  But it seems to me that

14   there was not much of a dispute in that case over what is

15   highly disputed in this case.

16            MR. WHITNEY:  Well, your Honor, I believe that the

17   defendant also touts itself as being one that could influence

18   consumer decisions.  In those disclaimers that you were

19   referring to earlier he says -- bear with me one moment, your

20   Honor -- that he promises to help thousands of potential

21   mattress purchasers through his website.  I mean, he --

22            THE COURT:  Well, I'll read you the entire -- this is

23   the entirety of Judge Engelmayer's decision on this issue.  As

24   I say, it comes in the very last part of his opinion.

25            "Fourth, the second amended complaint alleges that "as

1    a direct and proximate result of defendant's unlawful acts,

2    plaintiff has suffered significant monetary and reputational

3    injury, including direct diversion of sales and a lessening of

4    good will associated with the products.  According to the

5    secondhand amended complaint, defendant's members, many of whom

6    do not know the basic concepts that underlie computer issues,

7    rely on defendant's representations and recommendations when

8    purchasing the relevant products.  Indeed, the second amended

9    complaint alleges that defendant itself acknowledges its

10   ability to influence customers."  There's a quote from the

11   defendant's materials, and then the Judge Engelmayer continues,

12   "And the cognizable materials show that at least one consumer

13   has heeded defendant's advice to plaintiff's detriment," which

14   we certainly don't have in this case.  "These allegations

15   adequately plead that plaintiff's business has been injured as

16   a result of defendant's misrepresentations."

17         It is a barebones discussion, at best, because it

18   clearly is the least important issue of what was before Judge

19   Engelmayer, as shown by where he places it in his opinion.

20   It's dealt with in a single paragraph and includes both, in

21   effect, an acknowledgment by the defendant and an actual

22   example of some consumer who has relied, to his detriment, on

23   the material misrepresentations.

24         So it's certainly not harmful to you, but I don't see

25   why it's particularly material.

1          MR. WHITNEY:  I don't want to rely too heavily on this

2    case, your Honor.  I'm not citing it as this is it, we've found

3    the gold standard.  I would just note that prior to the section

4    that you had read, it is towards the end, it's the last issue

5    he deals with, but there's the question -- the section starts

6    with, "Has ESG stated a Lanham Act claim for false

7    advertising," then goes back a few pages, and there's

8    discussion that flows from there, including a discussion, not a

9    lengthy one, but a discussion of how Lexmark applies to this

10   circumstance.  And that's really what I was referring to.

11         THE COURT:  Okay.  That's on page 22, and I haven't

12   looked at that.

13         MR. WHITNEY:  Again, your Honor, there are factual

14   differences.  I do believe the defendant in this case probably

15   went further than the defendants in our case.  In fact, there

16   was a claim for defamation that we are not making here.  So

17   certainly, there are statements that are being made.

18         The point was that it created -- it was a situation

19   where a plaintiff was suing a quote/unquote affiliate marketer,

20   and there is an objection as to whether there was standing

21   under Lexmark to do so, and the Lanham Act, and the Court said

22   that there was.  That was the purpose of citing that case, your

23   Honor.

24         THE COURT:  All right.  So I thank both sides for your

25   very helpful argument.  I will, so we can move this case along

1    one way or the other, get you a bottom line decision by the end

2    of this month.  I won't give you a full opinion, that will

3    follow in due course, but you will at least know where we

4    stand, which is either the whole thing is gone, the whole thing

5    remains, or in between.

6              Thanks very much.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25