UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
CASPER SLEEP, INC.,                      :
                                         :
                                         :   16 Civ. 3224 (JSR)
         Plaintiff,                      :
                                         :   OPINION AND ORDER
         -v-                             :
                                         :
JACK MITCHAM and MATTRES NERD LLC,       :

         Defendants.                     :
----------------------------------------x

JED S. RAKOFF, U.S.D.J.

     Plaintiff Casper Sleep, Inc. ("Casper") sells mattresses over

the internet. Defendants Jack Mitcham and Mattress Nerd LLC operate

a website that reviews mattresses. In this action, Casper alleges

that Mitcham misleads consumers, in violation of § 43(a) of the

Lanham Act and § 349 of the New York General Business Law, by

implying that his reviews are unbiased, when in fact he collects

sales commissions through affiliate marketing relationships with

many of Casper's competitors but not (any more) from Casper's.

     Now pending before the Court is defendants' motion to dismiss

plaintiff's Amended Complaint in its entirety pursuant to Rule

12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons that follow, the Court grants the motion in part and

denies it in part. In particular, the Court grants the motion to the

extent plaintiff's Lanham Act claim is premised on Mitcham's

generalized disclosures regarding his affiliate marketing

relationships. The Lanham Act claim survives, however, to the extent

1

that plaintiff seeks to recover damages flowing from Mitcham's alleged false and misleading statements regarding his affiliate relationship with plaintiff in particular. Finally, plaintiff's § 349 claim survives in its entirety.

Launched in 2014, plaintiff Casper describes itself "as an innovative new sleep start-up, radically disrupting the traditional mattress industry with one mattress sold directly to consumers online with a risk free in-home trial — eliminating mattress stores and their inflated prices." Am. Compl. ¶ 2, ECF No. 17. The fledgling company is successful, having generated over $100 million in revenue in its first calendar year of operations and having attracted nearly $70 million in investment. See id. ¶ 16.

Defendant Jack Mitcham is the proprietor of http://www.mattressnerd.com ("MattressNerd.com"), which is allegedly operated through defendant Mattress Nerd LLC. See id. ¶¶ 12-13. Mitcham has direct affiliate marketing relationships with Casper's competitors (but no longer with Casper), meaning that he collects sales commissions from those competitors when his readers purchase products through "affiliate" links on his website or with coupon codes that he provides. See id. ¶¶ 30-32.[1] Pursuant to non-binding guidance issued by the Federal Trade Commission (the "FTC") in 2009,

---

[1] Per Casper's Amended Complaint, "[a]n affiliate link is a unique URL leading to a retailer's website that contains an identifier associated with the affiliate. When a customer arrives at the retailer's website by clicking on this URL link, any resulting purchases are tracked and the affiliate receives a commission on each purchase." Am. Compl. ¶ 21.

"[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (i.e., the connection is not reasonably expected by the audience), such connection must be fully disclosed." Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.5.

In an apparent effort to comply with the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. §§ 41-58, Mitcham includes a general "Affiliate Disclaimer" that appears on each page of his website. The Affiliate Disclaimer (also referred to in the Amended Complaint as the "Sidebar Disclosure") provides as follows:

> On my site, I will often recommend products and link to other websites.
>
> In many of those cases, I get paid a small commission if you end up purchasing anything through those links. Unlike a mattress salesman in a store, I don't just get paid commission from one brand or one retailer; I'm an affiliate for *many* different companies, so *I can help find you great deals no matter where they are*.
>
> **I have not been paid to write any of these articles** and all of these opinions are completely my own. I also do not accept paid advertising placement on my site.
>
> My only compensation is when I help match a reader to the right product, and that reader makes the purchase through a link on my site. In this way, I can act as a **brand-agnostic and retailer-agnostic** salesman.

Am. Compl. ¶ 44 (emphases in original).

Mitcham also includes disclaimers at the bottom of his mattress reviews, which "generally state that Mitcham is an affiliate of the relevant mattress company or companies and that Mitcham receives a

'small commission' if readers purchase a mattress through one of his affiliate links." Id. ¶ 48.

The thrust of plaintiff's Amended Complaint is that, despite these disclosures, "Mitcham misleads consumers to believe that The Mattress Nerd reviews are independent and unbiased," when "[i]n fact, they are intended to sell mattresses made by Mitcham's affiliates." Id. ¶ 42. In addition to the substance of the Affiliate Disclaimer itself, Casper points to MattressNerd.com's "About the Mattress Nerd" page, which is accompanied by the Affiliate Disclaimer, and provides in relevant part as follows:

> Buying a mattress can be a confusing experience. There is a lot of information about mattress shopping online, but a lot of it is confusing, contradictory, and sometimes just plain wrong. Additionally, it's difficult to find an unbiased source. Many mattress guides out there are written by the companies trying to sell you their particular mattress.
>
> People have the same two concerns when buying a mattress. **They don't want to buy the wrong mattress, and they don't want to spend a penny more than they have to.** It is my goal to make sure you don't make either of these mistakes. I worked as a salesman for a mattress retailer for 7 years before I started this website, so I have a lot of experience with helping people how to find the right mattress. Now, instead of helping one person at a time, I can help thousands a day through my website. I know the ins and outs of the mattress business, and now I've switched teams to be on the side of the customer.
>
> I focus on three major topics here on The Mattress Nerd:
>
> - How to find the correct mattress in the sea of choices out there
> - How to comparison shop and negotiate for the best possible price
> - General sleep tips and accessories

See "About the Mattress Nerd," http://www.mattressnerd.com/about/
(last visited Aug. 31, 2016) (emphasis in original).[2]

In Casper's telling, by allegedly holding himself out as an
independent, unbiased mattress reviewer, "Mitcham is part of a
surreptitious economy of affiliate scam operators who have become
the online versions of the same commission-hungry mattress salesmen
that online mattress shoppers have sought to avoid." Am. Compl. ¶ 5.
Casper asserts that Mitcham's alleged "fail[ure] to sufficiently
disclose his material connections to" Casper's competitors renders
his readers "unable to consider those connections in weighing the
value of Mitcham's endorsements," id. ¶ 34, leading in turn to
diversion of potential Casper sales and dilution of Casper's
goodwill in the marketplace, see id. ¶¶ 66, 75.

Relying on these allegations, Casper commenced this action on
April 29, 2016, bringing one claim for false advertising under
§ 43(a) of the Lanham Act and one claim for deceptive practices
under § 349 of the New York General Business Law. On June 9, 2016,
Casper filed the operative Amended Complaint.

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must
contain sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

---

[2] Casper excerpts and provides a link to the "About the Mattress
Nerd" page at ¶ 29 of its Amended Complaint. As such, the "About the
Mattress Nerd" page was incorporated by reference into the Amended
Complaint and the page is properly before the Court on defendants'
motion to dismiss. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104,
111 (2d Cir. 2010).

556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original); Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) ("At the 12(b)(6) stage, [t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." (internal quotation marks omitted)). Accordingly, in conducting that test, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. See Duffey v. Twentieth Century Fox Film Corp., 14 F. Supp. 3d 120, 126 (S.D.N.Y. 2014). The Court need not credit, however, "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678. "[L]egal conclusions masquerading as factual conclusions will not suffice." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006).

Beginning with plaintiff's Lanham Act claim, § 43(a)(1) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1), provides as follows:

> Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial

activities, shall be liable in a civil action by any
person who believes that he or she is or is likely to be
damaged by such act.

15 U.S.C. § 1125(a)(1).

To prevail on a false-advertising claim under § 43(a) of the
Lanham Act, "a plaintiff must show that either: 1) the challenged
advertisement is literally false, or 2) while the advertisement is
literally true it is nevertheless likely to mislead or confuse
consumers." Johnson & Johnson * Merck Consumer Pharm. Co. v.
Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir. 1992).

Defendants argue that Casper lacks "prudential standing" to
bring its Lanham Act claim and moves for dismissal of the claim
under Rule 12(b)(1) for lack of subject-matter jurisdiction.
Defendants offer a grab bag of reasons for why plaintiff lacks
"standing," ranging from a claim that plaintiff's cause of action
belongs exclusively to the FTC to an argument that Mitcham's alleged
misstatements and omissions did not proximately cause plaintiff's
injury. But as a threshold matter, the Supreme Court recently
indicated that "prudential standing" is a misnomer – at least in the
context of the Lanham Act. Per the Supreme Court's recent decision
in Lexmark International, Inc. v. Static Control Components, Inc.,
134 S. Ct. 1377 (2014), the inquiries traditionally undertaken under
the "prudential standing" rubric (e.g., the zone-of-interests test)
do not implicate standing at all, but instead simply go to whether
the particular plaintiff "has a cause of action under the statute."
Id. at 1387. "This inquiry 'does not belong' to the family of

7

standing inquiries . . . because 'the absence of a valid . . . cause

of action does not implicate subject-matter jurisdiction . . . .'"

Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352,

359 (2d Cir. 2016) (quoting Lexmark Int'l, Inc., 134 S. Ct. at 1386

n.4, 1387). Given that, defendants' arguments for dismissal are all

more properly classified under Rule 12(b)(6) as arguments that

plaintiff fails to state a claim. Those arguments, among defendants'

other arguments for dismissal, are addressed below.

        To begin with, to the extent defendants argue that plaintiff's

claim should be dismissed because plaintiff is "really" alleging a

violation of the FTC Act, that argument fails. Though the Amended

Complaint leans heavily on the allegation that Mitcham's disclosures

run afoul of the FTC Act, which does not confer a private right of

action, courts have held that a "plaintiff may and should rely on

FTC guidelines as a basis for asserting false advertising under the

Lanham Act." Manning Int'l Inc. v. Home Shopping Network, Inc., 152

F. Supp. 2d 432, 437 (S.D.N.Y. 2001) (denying motion to dismiss

Lanham Act false-advertising claim premised on allegation that

defendant's description of gemstone products was inconsistent with

FTC guidelines); see also B. Sanfield, Inc. v. Finlay Fine Jewelry

Corp., 168 F.3d 967, 973 (7th Cir. 1999) (stating that "as the

administrative agency charged with preventing unfair trade

practices, the Commission's assessment of what constitutes deceptive

advertising," including under the Lanham Act, "commands deference

from the judiciary").

However, plaintiff's Lanham Act claim fails in substantial part for a more straightforward reason: many of the statements in question are simply not false or plausibly misleading. As defendants point out, § 43(a) of the Lanham Act does not impose an affirmative duty of disclosure. See Clark Consulting, Inc. v. Fin. Sols. Partners, LLC, 2005 WL 3097892, at *3 (S.D.N.Y. Nov. 17, 2005) ("The [Lanham] Act imposes no affirmative duty of disclosure . . . and a claim cannot be based on the failure to disclose a fact."); McNeilab, Inc. v. Am. Home Prods. Corp., 501 F. Supp. 517, 532 (S.D.N.Y. 1980) ("[A] failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under section 43(a) of the Lanham Act."). While it is true that omissions can be actionable under § 43(a) of the Lanham Act if they render affirmative statements false or misleading, plaintiff must point to such statements if its claim is to survive defendants' motion. See, e.g., Register.Com, Inc. v. Domain Registry of Am., Inc., 2002 WL 31894625, at *14 (S.D.N.Y. Dec. 27, 2002) ("[A] failure to disclose facts is not actionable under Lanham Act Section 43(a), unless the failure is relevant to an affirmative statement that is made false or misleading by its omission." (internal quotation marks and alterations omitted)); U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 921 (3d Cir. 1990) ("While it has been stated that a failure to disclose facts is not actionable under § 43(a), it is equally true that a statement is actionable under § 43(a) if it is affirmatively

9

misleading, partially incorrect, or untrue as a result of failure to disclose a material fact." (quoting J. Thomas McCarthy, <u>Trademarks and Unfair Competition</u> § 27:7B (2d ed. 1984))).

In the Affiliate Disclaimer, Mitcham discloses that he does not "just get paid commission from one brand or one retailer;" that he is an "affiliate for *many* different companies [such that he] can help find you great deals no matter where they are;" that he has "not been paid to write any of these articles;" and that because his "only compensation is when [he] help[s] match a reader to the right product, and that reader makes the purchase through a link on [his] site," he "can act as a brand-agnostic and retailer-agnostic salesman." Am. Compl. ¶ 44.

Plaintiff does not allege that any of these statements are false. Instead, it alleges that the Affiliate Disclaimer "affirmatively implies that Mitcham is an affiliate of virtually *all* the mattress companies whose products he reviews and therefore that his reviews remain unbiased despite these connections." <u>Id.</u> ¶ 47. "Virtually all" is not "all," however; Mitcham's disclosure that he is an "affiliate for *many* different companies" is perfectly accurate by plaintiff's own admission, <u>see</u> <u>id.</u> Ex. B, and necessarily means that Mitcham is <u>not</u> an affiliate of all mattress brands. It is implausible that Mitcham's readers would infer from an admission of pecuniary interest in some but not all mattress brands that Mitcham is, in fact, entirely unbiased. To the extent plaintiff takes issue with defendants' claim of "brand-agnosticism" and "retailer-

agnosticism," those statements are too subjective and opinion-laden
to support a Lanham Act claim. See Boule v. Hutton, 328 F.3d 84, 92
(2d Cir. 2003) ("A statement of opinion is not actionable under the
Lanham Act if it could not reasonably be seen as stating or implying
provable facts about a competitor's goods or services." (internal
quotation marks omitted)); Lipton v. Nature Co., 71 F.3d 464, 474
(2d Cir. 1995) ("[S]ubjective claims about products, which cannot be
proven either true or false, are not actionable under the Lanham
Act."). Critically, the Lanham Act does not prevent commercial
actors from putting a positive spin on the nature of their goods or
services. Accordingly, plaintiff's Lanham Act claim fails to the
extent it is based on the Affiliate Disclaimer.[3]

     The same goes for the statements that appear on the "About the
Mattress Nerd" page, in which Mitcham writes that (1) "it's
difficult to find an unbiased source" for mattress information; (2)
that "[m]any mattress guides out there are written by the companies
trying to sell you their particular mattress;" (3) that he has
"switched teams to be on the side of the customer;" and (4) that he
promises to "help thousands [of potential mattress purchasers] a day
through [his] website." Am. Compl. ¶ 29. Plaintiff makes no
allegation that the first two statements are false, and the latter

---

[3] To the extent plaintiff contends that the reference to a "small
commission" in the Affiliate Disclaimer is misleading because
Mitcham's commissions from affiliates are, in fact, "meaningful,"
Am. Compl. ¶ 32, plaintiff's allegation in this regard is too vague
and conclusory to support a Lanham Act claim premised on the
Affiliate Disclaimer.

two statements are unprovable, inactionable puffery. See Lipton, 71 F.3d at 474 (holding that claim that research was "thorough" was inactionable under Lanham Act because "mere 'puffing' . . . does not constitute false advertising"). Plaintiff's argument is less that any one of Mitcham's statements in the Affiliate Disclaimer or the "About the Mattress Nerd" page is false or misleading and more that these statements, lumped together, create a misleading air of objectivity - notwithstanding that the Affiliate Disclaimer itself explicitly acknowledges Mitcham's pecuniary interest in driving mattress sales to affiliates. This nebulous theory is insufficiently tied to an actionable "description" or "representation of fact" to give rise to liability under the Lanham Act. 15 U.S.C. § 1125(a)(1).

Plaintiff's Lanham Act claim survives, however, to the extent it is premised on specific instances in which Mitcham has directly suggested on MattressNerd.com that he has an affiliate relationship with Casper. For example, MattressNerd.com contains a three-way comparison of Casper, Tuft and Needle, and Saatva mattresses. See Am. Compl. ¶ 37. Plaintiff alleges that although Mitcham's comparison originally named Casper the winner of this face-off, Mitcham updated the post after Casper terminated its affiliate relationship with Mitcham so as to recommend a different mattress company altogether with whom he is affiliated (namely, Leesa). See id. Yet, at the time of the filing of this action, the three-way comparison allegedly falsely stated that Mitcham is an "*affiliate for all of the companies mentioned in the article.*" Id. ¶ 53. In

contrast to the statements in the Affiliate Disclaimer and on the
"About the Mattress Nerd" page, this statement is alleged to be a
literal falsehood and thus is not subject to dismissal on the
grounds discussed above.[4]

Similarly, Mitcham's review of the Casper mattress – which
repeatedly recommends Casper's competitors over Casper – contains
affiliate links to various of Casper's competitors' products, along
with Amazon.com links to Casper and Tuft and Needle. See id. ¶¶ 40,
52.[5] But in his "Disclaimer" at the bottom of the review, Mitcham
groups his relationships with the competitors together, stating
that, "[t]his article includes 'affiliate links,' meaning that I'd
get paid a commission if you purchased anything from them." Id.
¶ 52. While this presents a closer call than the alleged literal
falsehood included in the three-way comparison, this disclaimer
(like the alleged misstatement described above) plausibly materially
misleads consumers by directly suggesting that Mitcham has the same
pecuniary interest in pushing sales of Casper that he does in

---

[4] Defendants do not argue that the statements in question do not
constitute "commercial advertising or promotion" under § 43(a)(1)(B)
as a matter of law. Nor they do they argue that the alleged
misrepresentations do not concern "an inherent quality or
characteristic of [defendants'] product" as a matter of law. S.C.
Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001)
(internal quotation marks omitted). The Court thus declines to
consider these arguments.

[5] Plaintiff alleges that "when users purchase a Casper mattress (or
any other product) on Amazon after clicking on Mitcham's Amazon
link, Mitcham receives a small payment if Amazon processes the
transaction." Am. Compl. ¶ 30.

pushing sales of each of the other mattress companies mentioned in
the review.

Defendants' remaining arguments for the dismissal of
plaintiff's Lanham Act claim in its entirety are unavailing.

First, defendants' suggestion that the claim fails because
defendants do not directly compete with plaintiff is foreclosed by
Lexmark, which explained that a direct-competition requirement would
"distort[] the statutory language" of the Lanham Act. Lexmark Int'l,
Inc., 134 S. Ct. at 1392 ("'[T]here need be no competition in unfair
competition,' just as '[t]here is no soda in soda water, no grapes
in grape fruit, no bread in bread fruit, and a clothes horse is not
a horse but is good enough to hang things on.'" (quoting Edward S.
Rogers, Book Review, 39 Yale L.J. 297, 299 (1929))). To be sure,
this action "does not present the classic Lanham Act false-
advertising claim in which one competitor directly injures another
by making false statements about his own goods or the competitor's
goods and thus inducing customers to switch." Id. at 1393 (internal
quotation marks and alterations omitted). But there is no
requirement that false-advertising claims under the Lanham Act be
limited to the typical fact pattern. See id. ("[A]lthough diversion
of sales to a direct competitor may be the paradigmatic direct
injury from false advertising, it is not the only type of injury
cognizable under § 1125(a)."); Vitamins Online, Inc. v. Heartwise,
Inc., 2016 WL 538458, at *6-7 (D. Utah Feb. 9, 2016) (agreeing that

"the Lanham Act is broad enough to cover new deceptive practices
. . . that have and will arise in e-commerce").

Second, defendants' related contention that plaintiff's claim
fails because plaintiff does not allege that Mitcham made any false
or misleading statements about plaintiff's products is meritless.
Section 43(a) unambiguously encompasses false or misleading
statements about one's own goods or services. See 15 U.S.C.
§ 1125(a)(1)(B) (creating liability for false or misleading
statements made by the speaker regarding "his or her or another
person's goods, services, or commercial activities").

Third and finally, defendants' argument that Casper's alleged
injuries were, as a matter of law, not proximately caused by
Mitcham's allegedly inadequate disclosures, likewise fails.
Proximate causation is, of course, an element of a Lanham Act claim
that must be adequately pleaded. See Lexmark Int'l, Inc., 134 S. Ct.
at 1395 ("To invoke the Lanham Act's cause of action for false
advertising, a plaintiff must plead (and ultimately prove) an injury
to a commercial interest in sales or business reputation proximately
caused by the defendant's misrepresentations."). Lexmark further
held that in order to establish proximate causation, "a plaintiff
suing under § 1125(a) ordinarily must show economic or reputational
injury flowing directly from the deception wrought by the
defendant's advertising; and that that occurs when deception of
consumers causes them to withhold trade from the plaintiff." Id. at
1391.

Here, plaintiff alleges, in relevant part, that Mitcham's statements suggesting that he has the same financial interest in sales of Casper products as he does in sales of competitors' products caused plaintiff lost sales and diminished its goodwill in the marketplace. Given that the reviews discussed above recommend Casper's competitors' mattresses over Casper's mattresses, it is perfectly plausible that the alleged "deception . . . cause[d] [consumers] to withhold trade from the plaintiff," such that Casper suffered "economic or reputational injury flowing directly from the [alleged] deception." Id. Put differently, to the extent that accurate representations – or even no representations at all – would have resulted in fewer diverted sales for Casper and mitigated the negative impact on its reputation, the alleged misrepresentations proximately caused the alleged harm.[6]

---

[6] Defendants rely heavily on an Eastern District of Virginia case, in which a tax settlement business that had been rated poorly by the Better Business Bureau (the "BBB") brought a § 43(a) claim against the BBB alleging that it had been harmed by the defendants' misleading description of its ratings as based on a "national, uniform, and unbiased standard." Wall & Assocs., Inc. v. Better Bus. Bureau of Cent. Va., Inc., 2016 WL 3087055 (E.D. Va. May 31, 2016). The district court dismissed the claim because "[w]hile the asserted injury may have been proximately caused by the unfavorable ratings, [plaintiff] has not adequately alleged a direct injury caused by Defendants' characterizations of its rating system as uniform, objective, and unbiased." Id. at *3. However, though the case is superficially analogous, it is distinguishable on at least two significant grounds. First, this Court has allowed plaintiff's Lanham Act claim to survive only to the extent Mitcham made false or misleading statements about his affiliate relationship with, specifically, Casper. There does not appear to have been any allegation in Wall that the BBB made false or misleading statements directly tied to the plaintiff in that case. See id. at *2 ("[T]he claim centers on Defendants' self-characterizations of the BBB

Turning to plaintiff's second cause of action, § 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." N.Y. Gen. Bus. Law § 349(a). "[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice." Id. § 349(h). While that private right of action was included to "allow[] [consumers] to bring suit on their own behalf without relying on the Attorney General for enforcement," Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc., 818 N.E.2d 1140, 1143 (N.Y. 2004), "[t]he critical question . . . is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor," Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995).

To adequately plead a claim under § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015) (internal quotation marks omitted). In addition, plaintiff must

---

rating system in promoting its accreditation services."). Second, the district court in Wall found that the plaintiff had failed to plead proximate causation in part because the "overlap" between the plaintiff's customers and the BBB's customers was insufficient. Id. The overlap between plaintiff's and defendants' prospective customers in this case is much tighter and arguably 1:1.

plausibly plead that the challenged "acts or practices have a broader impact on consumers at large." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741, 744 (N.Y. 1995); see also Securitron Magnalock Corp., 65 F.3d at 264 ("It is clear that 'the gravamen of the complaint must be consumer injury or harm to the public interest.'"). "Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." Oswego, 647 N.E.2d at 744.

Although the parties largely agree on the foregoing, defendants go further and contend that the alleged "injury must include some potential danger to the public health or safety." Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, 2014 WL 4723299, at *4 (S.D.N.Y. Sept. 23, 2014). Defendants further assert that because plaintiff is a commercial actor, it must allege conduct that has "significant ramifications for the public at large." Shred-It USA, Inc. v. Mobile Data Shred, Inc., 228 F. Supp. 2d 455, 465 (S.D.N.Y. 2002) (internal quotation marks omitted). Plaintiff, for its part, argues that defendants misstate the relevant pleading requirements and that § 349 encompasses "those acts or practices which undermine a consumer's ability to evaluate his or her market options and to make a free and intelligent choice." N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 953 N.Y.S.2d 96, 102 (2d Dep't 2012).

The dispute between the parties over the scope of § 349 is not surprising given that courts have significantly differed in articulating its scope. On the one hand, the New York Court of

Appeals and the Second Circuit have repeatedly held that the "[t]he 'consumer-oriented' requirement may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers.'" See Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010) (quoting Oswego, 647 N.E.2d at 745). On the other hand, some district courts have interpreted § 349 much more narrowly, dismissing claims because they did not adequately plead "significant ramifications for the public at large," Shred-It USA, Inc., 228 F. Supp. 2d at 465 (internal quotation marks omitted), or "potential danger to the public health or safety," Romeo & Juliette Laser Hair Removal, Inc., 2014 WL 4723299, at *4.

In this Court's view, the elevated requirements that some district courts have apparently engrafted onto the "consumer-oriented" element of § 349 claims lack a basis in governing New York law. See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he New York Court of Appeals['] . . . construction of New York State law binds this Court."). As a threshold matter, the New York Court of Appeals has emphasized that "section 349 is a broad, remedial statute and that the provision creating a private right of action employs expansive language." Blue Cross & Blue Shield of N.J., Inc., 818 N.E.2d at 1144. As such, § 349 "appl[ies] to virtually all economic activity, and [its] application has been correspondingly broad," as "[t]he reach of [this] statute[] provide[s] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague

19

consumers in [New York]." Karlin v. IVF Am., Inc., 712 N.E.2d 662, 665 (N.Y. 1999) (internal quotation marks omitted); see also Aghaeepour v. N. Leasing Sys., Inc., 2015 WL 7758894, at *14 (S.D.N.Y. Dec. 1, 2015) ("[T]he requirement that defendants engage in consumer-oriented conduct has been construed liberally."). In other words, the "statute seeks to secure an honest market place where trust, and not deception, prevails." Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190, 1195 (N.Y. 2002) (internal quotation marks omitted).[7]

Defendants' suggestion that the allegedly deceptive practice must pose some danger to the public health or safety, or have "significant ramifications" for the public, is simply wrong. Cf. N. State Autobahn, Inc., 953 N.Y.S.2d at 102 ("To require a showing of specific quantifiable harm to the public at large goes beyond the Court of Appeals' statement that a plaintiff need only show an 'impact' on consumers."). The "significant ramifications" formulation has been employed by some district courts but never adopted, to this Court's knowledge, by the Second Circuit or a New York state court. The notion that a § 349 claim must implicate the public health or safety can be traced to a misreading of a 1997 district court decision, which noted that "federal courts have

---

[7] Thus, even the sale of high-end wine has been held sufficiently "consumer-oriented" to support a claim under § 349. Koch v. Greenberg, 626 F. App'x 335, 340 (2d Cir. 2015) ("[G]iven that the defendant provided wine to be sold at auction to other consumers similarly situated to [plaintiff], the consumer-oriented conduct requirement has been met.").

interpreted the statute's scope as limited to the types of offenses
to the public interest that would trigger Federal Trade Commission
intervention under 15 U.S.C. § 45," and identified "potential danger
to the public health or safety" as an example of such an offense.
Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 1997 WL
137443, at *2 (S.D.N.Y. Mar. 24, 1997).

     Indeed, in Oswego, there was no monumental public interest at
stake, let alone a threat to public health or safety. The case was
brought against a bank by two pension funds alleging that the bank
did not adequately disclose upon plaintiffs' opening of savings
accounts that interest would not be paid on deposits in excess of
$100,000. See Oswego, 647 N.E.2d at 743-44. The Court of Appeals
noted that the defendant dealt with the plaintiffs in the same way
it dealt with any customer seeking to open a savings accounts. See
id. at 745. As such, "the acts [plaintiffs] complain[ed] of [were]
consumer-oriented in the sense that they potentially affect[ed]
similarly situated consumers," and the Court of Appeals reversed the
Appellate Division's grant of summary judgment to the defendant-
bank. Id. The Court's focus was not on the magnitude of the public
interest at stake or the identity of the claimant, but rather on
whether the complained-of acts represented a one-off, "single shot
transaction," on the one hand, or a way of doing business, on the
other. Id. (internal quotation marks omitted).

     Here, defendants operate a website that Mitcham allegedly
promotes "as a source for personally informed, independent, and

unbiased mattress reviews." Am. Compl. ¶ 29. Mitcham's website,
reviews, and disclosures are plainly geared toward consumers, and
"the conduct at issue potentially affects similarly situated
consumers" because readers of the website browse the same site and
are subject to the same allegedly deceptive conduct. Wilson, 625
F.3d at 64 (internal quotation marks and alterations omitted). As
such, plaintiff has adequately pleaded "consumer-oriented" conduct.

    In addition, because the relevant question under § 349 is
whether defendants are engaged in a deceptive act or practice and
not whether they have plausibly engaged in false advertising under
the Lanham Act, there is nothing inconsistent about allowing
plaintiff's § 349 claim to proceed in its entirety while dismissing
plaintiff's Lanham Act claim in substantial part. Thus, though the
Court has found the Affiliate Disclaimer not actionable as a matter
of law for purposes of plaintiff's Lanham Act claim, that does not
render Mitcham's disclosures adequate for purposes of § 349. Section
349 is "substantially modelled on the Federal Trade Commission Act."
Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch, 593 F. Supp.
743, 752 (S.D.N.Y. 1984) ("[I]n interpreting the phrase 'deceptive
practices,' the New York courts have in large measure relied on the
Federal Trade Commission Act's definition of such practices."
(footnote omitted)); see also New York v. Feldman, 210 F. Supp. 2d
294, 302 (S.D.N.Y. 2002) (same). The Court's analysis of Mitcham's
disclosures under the Lanham Act, which imposes no affirmative duty
to disclose affiliate marketing relationships, has only tangential

bearing on how those disclosures fare under § 349, which arguably does require such disclosures – prominently and completely. Cf. 16 C.F.R. § 255.5 (advising "clear[] and conspicuous[]" disclosures "[w]hen there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement").

In sum, for the foregoing reasons, the Court hereby grants defendants' motion to dismiss in part and denies it in part. The Clerk of the Court is directed to close document number 18 on the docket of this case.

Dated:    New York, NY
          September  , 2016          _____
                                     JED S. RAKOFF, U.S.D.J.